IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

SARAH E. ISBELL, *et al.,*            )
                                      )
                Plaintiffs,           )
                                      )
vs.                                   )        Case No. CIV-11-1423-D
                                      )
CITY OF OKLAHOMA CITY,                )
OKLAHOMA, *et al.*,                   )
                                      )
                Defendants.           )

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Before the Court is Plaintiffs' Original Complaint, Motion for TRO and Injunction [Doc. No. 1], filed *pro se* on December 1, 2011, but now pursued with the assistance of counsel. On December 2, 2011, the Court issued a temporary restraining order (TRO) pursuant to Fed. R. Civ. P. 65, and set a preliminary injunction hearing to occur on December 7, 2011. On that date, the Court convened the scheduled hearing, at which Plaintiffs appeared personally and through their attorney of record, Mark E. Hammons. Defendant City of Oklahoma City[1] appeared through assistant municipal counselors, Richard C. Smith, Tina A. Hughes, and Jennifer M. Warren; Oklahoma City Police Chief William Citty and Assistant City Manager M.T. Berry also appeared. The Court received stipulations of the parties and the testimony of witnesses, and admitted documentary evidence and a video recording. In addition, the undersigned judge personally visited

---

[1] The Original Complaint names the City and four city officials as defendants. However, because the individual defendants are sued in their official capacities, the action against them is treated as a suit against the government entity of which they are officers or agents. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *see also Bender v. Williamsport Area Sch. Dist*., 475 U.S. 534, 544 (1986); *Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988).

and viewed Kerr Park during daytime hours on December 8, 2011, accompanied by counsel for the parties.  Finally, the Court received supplemental filings as permitted by the Court's instructions at the hearing.  The Court now issues its ruling on Plaintiffs' request for a preliminary injunction.

I.

Background

This civil rights action under 42 U.S.C. § 1983 seeks declaratory and injunctive relief and damages for alleged violations of Plaintiffs' First Amendment rights of free speech, peaceable assembly, and petition,[2] and alleged violations of their Fourteenth Amendment rights of procedural and substantive due process.  Plaintiffs are organizers or participants in a political protest group known as "Occupy OKC," which is a local part of a nationwide movement patterned after Occupy Wall Street.  Occupy OKC obtained a permit for a political rally and began occupying a downtown Oklahoma City municipal park area, Kerr Park, on approximately October 11, 2011.  Members of the group continuously extended or renewed the permit until November 28, 2011, when Plaintiff Sarah E. Isbell's attempt to extend the permit was refused.  Although Occupy OKC was advised to vacate Kerr Park by 11:00 p.m. that day, city officials subsequently agreed to wait while Occupy OKC sought court intervention.  The TRO entered by the Court enjoined the City from removing Occupy OKC from Kerr Park for ten days, in order to preserve the *status quo* and permit a more deliberate and informed decision of the issues presented.

By this action, Plaintiffs challenge the City's enforcement, or threatened enforcement, of municipal ordinances setting park hours, requiring permits for special events, and restricting

---

[2]  It is well settled that the protections of the First Amendment are applicable to state and local governments under the Fourteenth Amendment.  *See*, *e.g.*, *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1192 (10th Cir. 2003).

camping activities.  Plaintiffs contend these municipal ordinances are unconstitutional, or are unconstitutional as applied to them, and that municipal officials are taking retaliatory action against members of Occupy OKC based on their exercise of First Amendment rights.  Plaintiffs also claim they have been arbitrarily denied a park permit and effectively banned from Kerr Park without a means of appeal or review of the decision.  As pertinent here, the Original Complaint seeks an injunction prohibiting the City from "banning Plaintiffs, Occupy OKC protestors or any other individuals from Kerr Park or any other City public park during the hours of 11pm to 5am, and/or of requiring any special use or other permit or payment of fees . . . , for the privilege of conducting a continuous political protest and exercise of their rights to free speech and expression and to peaceably assemble to redress the grievances of their government . . . ."[3] *See* Original Compl. [Doc. No. 1] ¶ 5.09.

In its written objection, the City denies it has taken any action directed at Plaintiffs because of the content of their speech or political activities.  The City contends its municipal ordinances and park regulations establish reasonable, content-neutral restrictions that it has a legitimate interest in enforcing.  The City asserts that Occupy OKC received a special event permit that allowed protestors to remain in Kerr Park between the hours of 11:00 p.m. to 5:00 a.m. daily, when parks are normally closed to the public, but that this resulted in persons camping in the park, which is not permitted.  The City also contends that a member of Occupy OKC spoke in opposition to the non-renewal of the permit for use of Kerr Park at a meeting of the City Council, which upheld the decision, and that a health department inspector who visited Kerr Park found unsanitary conditions.

---

[3] This general request is followed by an enumerated list of ten actions by Defendants that the proposed injunction would expressly enjoin.

After retaining counsel, Plaintiffs have filed a brief in support of their request for a preliminary injunction that narrows the issues to be addressed. By their brief, Plaintiffs now focus their request on the City's planned enforcement of a nighttime curfew in Kerr Park between 11:00 p.m. and 5:00 a.m. and its refusal to permit continued sleeping or camping in tents there. Plaintiffs do not currently challenge the requirement of obtaining a permit and paying daily fees. Further, Plaintiffs state unequivocally that, for purposes of obtaining a preliminary injunction, they do not challenge whether the applicable municipal ordinances, which restrict use of Kerr Park, are content neutral. Rather, Plaintiffs assert only that the restrictions *as applied* to them are based on the content of their speech and, alternatively, are unreasonable restrictions on the "time, place and manner" of First Amendment activities. *See* Plaintiffs' Br. [Doc. No. 13] at 6.[4]

II.

Preliminary Injunction Standards

The standard for issuance of a preliminary injunction is familiar. "To obtain a preliminary injunction, a plaintiff must show: '(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public's interest.'" *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) (quoting *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010)); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is 'clear and unequivocal.'" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Kikumura v.*

_____

[4] Notably, Plaintiffs also do not seek a preliminary injunction based on the claim that they were denied due process in connection with the City's decision not to extend or renew the permit.

*Hurley*, 242 F.3d 950, 955 (10th Cir.2001)); *see also Schrier v. University of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal quotations and citations omitted).

In this federal circuit, courts generally apply a modified standard under which, if a movant establishes that other requirements tip strongly in his favor, the movant "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir.2003); *see O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc), *aff'd sub nom.*, 546 U.S. 418 (2006).  The modified standard does not apply, however, to certain types of "historically disfavored" preliminary injunctions, for which a movant must satisfy a heightened burden and make a strong showing that all four factors are met.  *See O Centro*, 389 F.3d at 975; *see also Attorney General v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  In addition, the modified standard does not apply where the movant seeks "to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  *See Heideman*, 348 F.3d at 1189; *see also Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006); *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006).  Courts "presume that all governmental action pursuant to a statutory scheme is 'taken in the public interest.'"  *See Aid for Women*, 441 F.3d at 1115 n.15.

For reasons fully explained herein, the Court finds that Plaintiffs are seeking to restrain municipal action in the public interest within the scope of the City's regulatory authority, and therefore, the modified standard does not apply.  Thus, Plaintiffs "must meet the traditional 'substantial likelihood of success' standard."  *Nova Health Sys.*, 460 F.3d at 1298 n.6.

III.

Stipulations of Fact

The parties have stipulated and agreed to certain facts.

1.      Plaintiffs are Sarah Elizabeth Isbell, Shannon Hunnicutt, Rob Leroy, Brett Habbyshaw, and Mark Faulk.  Each plaintiff is affiliated with, and a supporter of, Occupy OKC. Occupy OKC is affiliated with Occupy Wall Street.  Plaintiffs and Occupy OKC have organized to present a political and social message which, in its short form, states that there is too much economic disparity between the wealthy and the rest of the country and that money is corrupting the political process.

2.      The location of the disputed activity is Kerr Park in Oklahoma City, Oklahoma, on Broadway Avenue between Couch Drive and Robert S. Kerr Avenue.  Kerr Park is a public park owned and operated by the City of Oklahoma City (the "City").  The City is the state's largest municipality and the situs of state government.

3.      A person or persons have been present in Kerr Park on a continuous basis, including tents and overnight sleeping, since October 11, 2011.  A person or persons have been present at this location under a special event permit for a political rally.  The permit was regularly renewed through a period ending November 27, 2011, at 11:00 p.m.  The City refused to renew the permit on November 28, 2011.

4.      The City has threatened to remove any persons or structures present in the park after 11:00 p.m. and before 5:00 a.m. and possibly to initiate criminal charges against any of Plaintiffs or members of Occupy OKC if they do not vacate the premises during the period between 11:00 p.m. and 5:00 a.m.

IV.

Findings of Fact

1.      Occupy OKC is a leaderless organization but has a leadership structure.  The persons in leadership roles have changed over time.  Ms. Isbell is one of the current leaders, and she was the permit holder who was refused a renewal on November 28, 2011.

2.      According to literature disseminated by the group, Occupy OKC is peaceably protesting against economic inequalities in American society and governments that it believes have been corrupted by large corporations, banks, and "wealthy elite," and are unresponsive to the needs of ordinary citizens and voters.  *See* Original Compl., Ex. 4 [Doc. No. 1-5].  Occupy OKC has adopted the declaration of the general assembly of Occupy Wall Street.  Occupy OKC desires to maintain a continuous public presence in order to keep its cause in front of government officials until its grievances are addressed.

3.      Although the group is inherently fluid, a current view of Occupy OKC, as expressed by Ms. Isbell, is that sleeping tents constitute a visual representation of the group's message; living in tents signifies poor and homeless people in a battle with Wall Street and government as a result of economic events, such as mortgage foreclosures and the financial crisis.  According to Ms. Isbell, Occupy OKC's encampment in Kerr Park – with tents visible even to motorists on nearby roadways – conveys a visual message in a way that cannot be accomplished at another location or by other means of expression.

4.      Membership in Occupy OKC is also fluid and primarily depends on self-identification or, perhaps, recognition by a person in a leadership role based on past participation. Homeless persons are generally welcome in the group if they agree with its message.

5.      Kerr Park lies within the City's downtown business and financial district among corporate offices and parking garages, and is situated near restaurants, bars, and entertainment venues. Employees going to and from work often pass through the park, sometimes on a daily basis. The park is composed of a paved and tiled plaza area, a fountain, landscaped areas, and a small amphitheater.  The park's boundaries are – at least in a visual sense – streets and sidewalks which form a narrow rectangle of approximately one block east to west, and one-third block north to south. It does not contain an exercise track.

6.      Occupy OKC's initial rally in Kerr Park on October 11, 2011, was attended by approximately 250 to 300 people.  Since that initial event, Occupy OKC has occupied Kerr Park by holding meetings and rallies, handing out flyers, erecting tents and structures, posting signs (some of which are affixed to tents), providing information and having discussions with persons who come to the park, making internet posts and broadcasts regarding its activities, and engaging in other political and social activities in the park.

7.      From October 11, 2011, until November 28, 2011, Occupy OKC was present in Kerr Park on a continuous basis under a special event permit issued by the Parks and Recreation Department, upon payment of a permit fee of $55.00 per day.

8.      Prior to October 11, 2011, leaders of Occupy OKC, including Jay Trenary, met with city officials and discussed plans to occupy Kerr Park.  The meeting included Police Chief William Citty, and they discussed staying overnight in the park.  Assistant City Manager M.T. Berry, who is responsible for oversight of public safety matters, was also consulted.  Chief Citty was supportive

of the exercise of First Amendment rights but made clear that complying with laws and satisfying conditions, such as providing a portable toilet, would be required.  Mr. Trenary and other leaders were advised that Occupy OKC would need a special event permit from the Parks and Recreation Department.  The group was also informed of the anticipated closure of Kerr Park for renovation; an adjacent structure was scheduled for demolition on November 28, 2011, and park renovations were anticipated in conjunction with the nearby private construction.

9.      The Oklahoma City Municipal Code in Chapter 38, regarding Parks, Recreation and Cultural Affairs, provides in pertinent part as follows:

§ 38-87. - Park hours

(a)     No person shall enter into or remain upon nor shall any vehicle be left unattended in any park area or facility between the hours of 11:00 p.m. and 5:00 a.m., unless they are using an exercise track, or extension of hours is approved by the Director [of Parks and Recreation Department or designee].

(b)     From the hours of 11:00 p.m. to 5:00 a.m. any individual or entity holding a valid permit regulated by this chapter and actually engaged in one of the permitted activities, shall be allowed to remain in any park or on City-operated reservations.

10.     As this ordinance was applied by city officials, the issuance of a special event permit would allow members of Occupy OKC to remain in Kerr Park between the hours of 11:00 p.m. and 5:00 a.m. to engage in the permitted activity.

11.     Mr. Trenary was the initial applicant for the special event permit, and he submitted an application with the assistance of a park department employee on October 10, 2011.  The stated purpose of the event was a political rally.  The permit was approved the same day.

12.     Mr. Berry was consulted regarding Occupy OKC's activities and permit status for Kerr Park.  He and other city officials did not understand initially that staying overnight in Kerr Park would involve people camping or living there.  When they did realize this was occurring, they

decided to overlook it as an accommodation to the new protest movement, in order to avoid confrontation and based on an assessment of the resources and risks involved in arresting large numbers of people.

13.     Camping is defined in Chapter 38 of the Oklahoma City Municipal Code, § 38-5(5), to mean "where a temporary shelter, such as a tent, is erected for lodging."  Chapter 38 addresses camping in an article regarding lake reservations and provides in § 38-298:  "Camping is permitted only within the areas designated for camping on the Lake Stanley Draper Reservation."[5]

14.     During October and November, 2011, Mr. Trenary was the permit holder and, with other Occupy OKC leaders, worked with the police department to avoid problems and maintain order.  However, the number of protestors dwindled until the people remaining in Kerr Park were, in Mr. Trenary's view, mainly transients or others who were causing disturbances and safety issues. On November 16 or 17, 2011, Mr. Trenary asked that his name be removed from the permit.

15.     During the time that Occupy OKC held a permit for the use of Kerr Park, a number of incidents required police action.  In addition to minor incidents, such as public intoxication and noise complaints, a death occurred in a tent on October 24, 2011.  To date, the cause of death remains undetermined, but police investigators found evidence of drug use.  On November 27, 2011, another serious incident occurred in which one or more persons staying in Kerr Park created a disturbance, resulting in damage to property and assault of a police officer.

---

[5] Plaintiffs seek to argue about the City's application of this camping restriction to parks due to the organizational structure of the chapter of the Municipal Code regarding parks and recreation, and the location of the ordinance in a particular article regarding city-owned lakes and lake reservations.  This challenge is ineffectual, however, because even an unwritten municipal policy, evenly applied, may be enforced.  *See Wells v. City of Denver*, 257 F.3d 1132, 1150 (10th Cir. 2001); *see also Summum v. City of Ogden*, 297 F.3d 995, 1007 (10th Cir. 2002); *Occupy Minneaplis v. County of Hennepin*, Civ. No. 11-3412 (RHK/TNL), 2011 WL 5878359 (D. Minn. Nov. 23, 2011) (to be published).  The ordinances pertinent here were enacted in 1994; Plaintiffs present nothing to suggest that the City has ever interpreted the ordinances differently.

16.     On November 28, 2011, a collective decision was made by responsible city officials, including Chief Citty and Mr. Berry, that Occupy OKC's permit should not be renewed.  The decision was based on several factors.  Mr. Berry recommended that camping activity be stopped but  daytime use of Kerr Park be allowed to continue, so long as park conditions and renovation plans allowed.  Chief Citty was concerned that organizers of Occupy OKC were no longer staying in Kerr Park at night and could not be reached when problems arose; in his view, there was a lack of accountability for incidents that occurred.   Tents erected by Occupy OKC were largely unoccupied and provided an open invitation for homeless persons unaffiliated with the group to stay there.  Police officers patrolling the area reported deteriorating conditions and a stench coming from the park.  Other concerns included complaints that the tents were obstructing the park, were discouraging others from using the park, and that the encampment was aesthetically damaging.

17.     According to regulations of the Parks and Recreation Department, a permit may be revoked or cancelled if use of a park by the general public is hindered, for reasons of public safety, or if municipal ordinances or departmental regulations are not followed.

18.     No evidence has been presented to show that any group or person other than Occupy OKC has been permitted to camp in a municipal park, including Kerr Park, under any circumstances.

19.     During the preliminary injunction hearing, the City pointed to an ordinance contained in the Oklahoma City Municipal Code in Chapter 50, regarding Streets and Sidewalks, which provides in § 50-5(a) as follows:

> No person shall leave, place or deposit, or cause to be left, placed or deposited, in, upon or across any pavement, sidewalk, or public way any article, object, or structure, or thing that will obstruct or otherwise encumber the same, unless expressly provided by ordinance or expressly authorized by revocable permit approved by the Director [of Public Works].

No showing was made as to the applicability of this provision to the public area at issue.  The tents and structures erected in Kerr Park do not appear to be placed across any sidewalk or public way.

20.     No evidence has been presented to show that any municipal ordinance or regulation would prohibit erecting a tent in a public park between the hours of 5:00 a.m. and 11:00 p.m., if the tent was not used for camping and did not exceed certain size limits, and if the number of tents did not impede the general public's use of the park.

21.     After the preliminary injunction hearing, Plaintiffs submitted declarations of Ms. Isbell and Mr. Leroy attesting to their willingness to supply the City with names and contact information for the leaders of Occupy OKC, and to have one or more persons on the list of leaders present at the encampment in Kerr Park at all times when tents are being used for lodging.

V.

Conclusions of Law

In light of the foregoing findings of fact and the principles of law governing preliminary injunctions, the Court reaches the following conclusions.

A.     Likelihood of Success on the Merits

The Court begins its analysis by considering the merits of Plaintiffs' claims because this is a critical factor in any First Amendment case, although other elements must also be evaluated.  *See Aid for Women*, 441 F.3d at 1120-21.  Plaintiffs must demonstrate a substantial likelihood of success on the claims for which preliminary injunctive relief is sought.  Upon consideration, the Court finds that Plaintiffs have not met their burden with respect to the requested injunction against the City's enforcement of park curfew hours and a ban on camping in Kerr Park.

It is well established that public sidewalks, streets, and parks "are 'quintessential' public forums for free speech." *See Hill v. Colorado*, 530 U.S. 703, 715 (2000).  A speaker's message may

be delivered in words and "by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Clark v. Community for Creative Non-Violence* 468 U.S. 288, 294 (1984).   The Court assumes in this case, like the Supreme Court did in *Clark*, that overnight sleeping in connection with a political protest to call attention to, *inter alia*, homelessness, is expressive conduct protected by the First Amendment. *See id*. at 293. Nevertheless, expression that is oral, written, or symbolized by conduct "is subject to reasonable time, place, or manner restrictions. . . . [R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.*   Further, symbolic expression "may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech." *Id*. at 294.

Here, as in *Clark*, there has been no showing that the City's camping restriction is content-based or is being applied to members of Occupy OKC because of a disagreement with their message. The City's restriction on camping – defined as erecting a temporary shelter, such as a tent, for lodging – is consistent with the restriction imposed by the federal park service in *Clark*. The Supreme Court held in *Clark* that prohibiting camping and overnight sleeping in centrally-located municipal parks was a permissible restriction, provided that these activities were permitted elsewhere and that other means of expressive conduct were available. See i*d*. at 294-96.  Such is the case here.  The City does not ban camping everywhere, but has established areas for it, and the City has no specific ordinance or rule that would prevent the erection of symbolic tents, signs, and messages during regular park hours.  In addition to the ability of Occupy OKC to protest in Kerr

Park between the hours of 5:00 a.m. and 11:00 p.m. (without the requirement of a permit for a protest of the current size), Plaintiffs have ample alternative methods of communicating their message at times when the park is closed, such as physical protests on non-park public property, distribution of written material, and via the Occupy OKC internet site.

Similarly, there has been no showing that closing a municipal park between the hours of 11:00 p.m. and 5:00 a.m. is an unreasonable time, place, and manner restriction.[6]  Plaintiffs seem to contend that the curfew is now being directed at Occupy OKC because participants were previously permitted to remain in Kerr Park 24 hours per day.  Rather than establishing that the curfew is now being directed at Plaintiffs and Occupy OKC, however, the Court finds that Occupy OKC desires favored treatment not previously extended to any other group.  The undisputed testimony of witnesses was that the extended occupation of Kerr Park is an unprecedented event, and one that the City has attempted in good faith to accommodate.  The Court is persuaded by the evidence presented and a viewing, accompanied by all counsel, of Kerr Park, that the City's decision to enforce the curfew is based on legitimate concerns about an encampment of persons living in the park and the resulting conditions that exist there, which conditions implicate clearly reasonable considerations of public safety, public health, access to parks by all citizens, the aesthetic quality of parks, and the maintenance of public property.  The curfew enforcement proposed by the City is inextricably linked under the circumstances of this case with the camping ban.  Plaintiffs have not merely placed symbolic tents in Kerr Park but have occupied the park by erecting camping tents and living there.  The Supreme Court has recognized that there is a substantial government interest in

---

[6]  The only exception to the park curfew expressly provided by the ordinance – for use of exercise tracks – has no applicability to Kerr Park.

conserving park property, which requires measures such as a proscription of camping, and this interest is unrelated to suppression of expression. *See Clark*, 468 U.S. at 299.

For these reasons, the Court finds that Plaintiffs have not made a sufficient showing of likely success on the merits of their claims of improper enforcement action by the City in derogation of Plaintiffs' First  Amendment rights.

B.      Likelihood of Irreparable Injury

Ordinarily, "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation omitted).  A movant "satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.2003)).  The law is well-settled that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). "It is necessary, however, to consider the specific character of the First Amendment claim." *See Heideman*, 348 F. 3d at 1190.

In this case, Plaintiffs claim they will be irreparably harmed by allowing the City to enforce the park curfew ordinance, resulting in the removal of Occupy OKC from Kerr Park from 11:00 p.m. to 5:00 a.m. each day, and allowing the City to prevent overnight camping in Kerr Park.  This claim is based on Plaintiffs' position that enforcement of the curfew and camping ban is constitutionally impermissible.  Because Plaintiffs' showing of irreparable harm is dependent on their ability to show

an unreasonable restraint of a First Amendment right, discussed *supra*, the Court finds that Plaintiffs have failed to make a sufficient showing of irreparable injury.

C.    Balance of Interests

The Court further finds that any injury to Plaintiffs from enforcement of the City's ordinances does not outweigh the harm that the City is likely to suffer from the issuance of a preliminary injunction.  Plaintiffs seek to enjoin the City from closing Kerr Park between 11:00 p.m. and 5:00 a.m. and enforcing the ban on camping.  For reasons stated herein, the Court agrees with the City that the requested injunction would be contrary to a federal policy of permitting governments to set reasonable restrictions on the use of public forums within their jurisdiction. Plaintiffs seek to strip the City of its right and ability to enforce general municipal ordinances and regulations designed to preserve public property for use by the general public and to maintain aesthetically pleasing park areas.  Under the circumstances, the Court finds that the balance of hardships between the parties supports the denial of Plaintiffs' request for a preliminary injunction that would prevent the City from enforcing these laws.

D.    Public Interest

Where, as here, a plaintiff relies on a public interest in ensuring that First Amendment expression is not unconstitutionally curtailed, and a governmental entity relies on a public interest in the enforcement of content-neutral regulations, "the 'public interest' prong of the preliminary injunction inquiry is nothing more than a restatement of the 'balance of hardships' prong."  *See Heideman*, 348 F.3d at 1191.  In this situation, under the court of appeals' analysis in *Heideman*, the public interest factor is not implicated and favors neither party.  Alternatively, as discussed *supra* with regard to the balance of interests, the Court finds that safeguarding the City's right to enforce

municipal laws of general applicability that place reasonable restrictions on the use of public parks, serves the public interest.

### VI.

### Conclusion

In summary, the Court concludes that Plaintiffs have not satisfied their burden to show that the circumstances of the case warrant extraordinary relief and that a preliminary injunction should issue to prevent the City from proceeding to enforce its laws regulating the use of Kerr Park. Accordingly, the Court declines to issue a preliminary injunction that would frustrate the City's interest to act reasonably to protect the welfare of its property and citizens.

## **ORDER**

IT IS THEREFORE ORDERED that Plaintiffs' Motion for a Preliminary Injunction [Doc. No. 1] is DENIED.[7]   In light of this Order, the Temporary Restraining Order [Doc. No. 10] previously entered is dissolved.

IT IS SO ORDERED this 12th day of December, 2011.

_____

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[7] The Court encourages the parties to confer regarding a reasonable and cooperative approach to the enforcement of the municipal ordinances addressed herein and the timing of compliance by Plaintiffs and other members of Occupy OKC.  Although they have sharply disagreed regarding the issues involved in this case, the parties have maintained open and civil lines of communication, and the Court is hopeful that they will continue to do so.